[Civ. No. 6841. Fifth Dist. Apr. 29, 1982.]

HOYT BENGE et al., Petitioners, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
MAC MACHINES et al., Real Parties in Interest.

338

COUNSEL

Sroloff & Biren, Matthew B. F. Biren and Thomas E. Bruyneel for Petitioners.

No appearance for Respondent.

Hurlbutt, Clevenger, Long & Vortmann, Robert P. Long, Nagel, Nagel & Harris, J. J. Nagel, McCormick, Barstow, Sheppard, Coyle &

Wayte, James H. Barstow, James P. Wagoner, Daniel P. Lyons, Brunn, Lacey & Thayer, Charles Brunn, Philip Harvey, Stammer, McKnight, Barnum & Bailey, Dean Bailey and Craig M. Mortensen for Real Parties in Interest.

OPINION

**FRANSON, Acting P. J.—**

STATEMENT OF THE CASE

This case involves four consolidated actions filed by 32 plaintiffs. Plaintiffs (hereinafter petitioners) are suing real parties in interest for damages resulting from lead poisoning which occurred when petitioners worked at the Visalia Prestolite Battery plant. Petitioners are members of a local chapter of the United Automobile, Aerospace and Agricultural Workers of America (hereinafter union).

In the summer of 1976, two union meetings were held at the Goshen Community Center. Only members of the union working at the Prestolite plant were invited to the meetings. Two attorneys retained by the union also were present. At the meetings, certain members apparently made statements concerning lead dust conditions at the plant. The attorneys advised the members of their legal rights concerning the lead dust. Of the approximately 65 union members present at the meeting, 32 ultimately retained one of the attorneys, Mr. Biren, to represent them in the instant action.

During depositions, real parties in interest sought to elicit information regarding the contents of the communications made at the meetings between the union members and their attorneys. Petitioners objected and refused to answer the questions claiming the attorney-client privilege.

Real parties in interest then moved in the superior court to compel answers to the questions and for a protective order in connection with future depositions of petitioners. Real parties in interest argued that what occurred at the meeting is relevant to the issue of whether the statute of limitations bars petitioners' suit, i.e., when petitioners knew or reasonably should have known they had a potential cause of action.

A trial on the single issue of the statute of limitations is set for May 3, 1982.

The superior court granted the motions to compel answers. Petitioners were ordered to disclose the following information about the union meetings: (a) persons present; (b) identity of persons who spoke; (c) identification of written documents circulated; (d) testimony concerning what was said by the speakers at the meetings; (e) what was specifically said at the meetings which caused petitioners to believe they had a cause of action against real parties in interest; (f) how petitioners became parties in the lawsuit; and (g) all facts and events which transpired at the meetings relating to the issue of lead intoxication or lead poisoning alleged to have been contracted by petitioners as a result of working at the Prestolite Battery plant.

When petitioners refused to comply with the disclosure order, contempt proceedings were initiated in the superior court. Thereafter, the California Supreme Court granted petitioners a hearing and transferred the matter to this court with directions to issue an alternative writ of mandate to be heard before the court. The Supreme Court also granted a stay of the contempt hearing in the superior court; the stay to continue in effect pending final determination of this matter by this court.

For reasons to be explained, we hold that petitioners have an attorney-client privilege with respect to all communications made at the meeting between petitioners and the other union members and the attorneys concerning the alleged lead dust at the Prestolite plant. Accordingly, we will issue a writ to set aside the trial court's order compelling petitioners to disclose the contents of the privileged communications made at the meetings.

STATEMENT OF FACTS[1]

Mr. Biren worked for a law firm which was on a retainer to the union. The retainer agreement required the firm to provide legal advice to the union *and its members.*

---

[1]In the interest of judicial economy and to expedite the trial on the statute of limitations, we have augmented the record by court order to include the depositions of Candelario Ramos and Elaine House which were not before the trial court when the motion to compel answers was granted. These depositions have been referred to in the briefs of petitioners and real parties in interest.

At the request of the full-time union representative assigned to the Visalia area, Biren was asked to attend a special meeting of union members working at the Visalia Prestolite facility. Biren attended the meeting to obtain information concerning the lead poisoning situation, to evaluate possible litigation, and to advise the union and its members of their rights.

Biren emphasized in a supplemental declaration that the meeting in question was not a regular union meeting because it was open only to union members who worked in the Visalia Prestolite facility. The local union is an amalgamated union which includes employees from many different facilities. Employees from other facilities were not invited to attend nor did they attend. The only persons present besides the Prestolite members were the two attorneys and possibly a doctor.

Biren declared the meeting was scheduled for a dual purpose. The union wanted him to advise it concerning its legal rights relative to the lead poisoning and as provided under the collective bargaining agreement in effect between Prestolite and the union. In addition, the union also requested that Biren consult with the individual members, collectively, concerning their individual right to take action against the company under the workers' compensation law as well as against third parties who might have contributed to the lead poisoning. Finally, Biren was asked by the union to advise the members concerning the advantage of a concerted action by the employees against the employer through the workers' compensation laws as contrasted with third party lawsuits.

Lewis Gonsolus, one of the petitioners, provided the following information during a deposition taken in August of 1981. Two meetings were held in the summertime of 1976 in which the union members consulted with the attorneys. Gonsolus was informed of the lead hazard just prior to the first meeting via a pamphlet provided by the union. The first meeting was a regular monthly meeting attended by the union employees, local union representatives and two attorneys. Gonsolus was told about the lead poisoning at this meeting. Gonsolus stated that prior to the first meeting he had not hired an attorney to represent him in filing a lawsuit against Prestolite, nor did he have an attorney personally representing him at the meeting. He also indicated he did not know there was going to be a discussion at the meeting regarding lead dust or

health problems.[2] The second meeting was held for the purpose of instigating a lawsuit. Gonsolus had been informed prior to the meeting that attorneys would be present. Apparently Gonsolus decided to participate in the lawsuit at the second meeting.

Candelario Ramos, another petitioner, was deposed in November of 1981. Ramos was the president of the local union at the time the 1976 meetings took place. He stated the attorneys were present at the first meeting because, "My membership, I think, was just disturbed by the fact that they were being laid off for having lead, high lead count after seeing the doctor and they were upset about the fact that every time they were laid off, they had to wait to get their pay after they were laid off a week or so, and they wanted to get some legal advice on that." Ramos and other members had requested the local full-time union representative to provide legal counsel. Ramos indicated the members were concerned about their rights under the workers' compensation law; however, no request was made for legal advice concerning lead in the plant. Ramos stated at the time of the meeting no attorneys had been retained to represent any of the union members in the present action. Union members were present at the meeting who did not become plaintiffs in the instant case.

Ramos also testified that a special second meeting was held shortly after the first meeting and the attorneys again were present. There may have been members present who did not become plaintiffs in this lawsuit. The meeting was for the benefit of union members who wished to discuss with the attorneys the lead poisoning in the plant. According to Ramos, the substance of the conversations between the members and the attorneys related to "What our feelings were on taking any legal course of action."

Elaine House, a supervisor at the Prestolite plant and a union official, was deposed in late 1981 and early 1982. She stated that prior to the 1976 meetings, both the international union and the local members were very concerned about excessive lead levels in the plant. The first meeting was held because employees had been complaining about the three-day waiting period for disability. In her position as an union offi-

---

[2]This appears to conflict with Gonsolus' earlier testimony that he had received a pamphlet just before the first meeting concerning the lead hazard at the plant. It should be kept in mind that Gonsolus' deposition along with the other depositions before this court were taken years after the 1976 meetings. Thus, the petitioners' memory of the events is understandably vague.

cial, House contacted the local full-time union representative and requested legal counselling. The first meeting with the attorneys was not a regularly scheduled meeting but a special meeting to address the workers' compensation issue. It was after the first meeting that House decided to retain counsel.

## DISCUSSION

■ The basic policy behind the attorney-client privilege is to promote the relationship between attorney and client by safeguarding the confidential disclosures of the client and the advice given by the attorney. This policy supports a liberal construction in favor of the exercise of the privilege. (*American Mut. Liab. Ins. Co.* v. *Superior Court* (1974) 38 Cal.App.3d 579, 593 [113 Cal.Rptr. 561]; see *Lohman* v. *Superior Court* (1978) 81 Cal.App.3d 90, 94 [146 Cal.Rptr. 171]; Witkin, Cal. Evidence (2d ed. 1966) Witnesses, § 795, p. 740.) Although the privilege may result in the suppression of relevant evidence, it is necessary to protect the client in making a full disclosure of the facts. (*City & County of S. F.* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.2d 1418].)

Evidence Code section 954 provides in relevant part: "Subject to Section 912 [waiver of privilege] and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:

"(a) The holder of the privilege;

"(b) A person who is authorized to claim the privilege by the holder of the privilege; or

"(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by person authorized to permit disclosure."

The "holder of the privilege," i.e., the person entitled to claim it (Evid. Code, § 954, subd. (a)), is the "client" (Evid. Code, § 953, subd. (a)). ■ In other words, the privilege belongs to the client and not the attorney. The client alone may waive it, the attorney in claiming it does so on behalf of the client, and the attorney, unless instructed other-

wise, must make the claim. (Evid. Code, §§ 953, 954, 955; see Witkin, Cal. Evidence, *supra*, § ·797, p. 742.)

"Client" means a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity. (Evid. Code, § 951.) ■ Since "person" includes corporations and other associations (Evid. Code, § 175), unincorporated organizations such as labor unions, social clubs, and fraternal societies have a lawyer-client privilege when the organization (rather than its individual members) is the client. (See Cal. Law Revision Com. com. to Evid. Code, § 952, 29B West's Ann. Evid. Code (1966 ed.) pp. 528-529; Deering's Ann. Evid. Code (1966 ed.) p. 444; Witkin, Cal. Evidence, *supra*, § 797, p. 742.)

During the course of the attorney-client relationship, the protected communication may consist of information transmitted between a client and his lawyer, advice given by the lawyer, or a legal opinion formed and given by the lawyer in the course of that relationship. (Evid. Code, § 952.) ■ "'(A)lmost any act, done by the client in the sight of the attorney and during the consultation, may conceivably be done by the client as the subject of a communication, and the only question will be whether, in the circumstances of the case, it was intended to be done as such.'" (*City & County of S. F. v. Superior Court, supra*, 37 Cal.2d 227, 235-236, quoting 8 Wigmore, Evidence (3d ed. 1940) § 2306, p. 590.) ■ The express inclusion of a "legal opinion" in the last clause of section 952 precludes inquiry into the lawyer's uncommunicated impressions and conclusions concerning the case. (Cal. Law Revision Com. com. to 1967 amendment to Evid. Code, § 952, 29B West's Ann. Evid. Code (1982 pocket supp.) p. 113; Deering's Ann. Evid. Code (1982 pocket supp.) p. 129.)

■ Although the information must have been transmitted, or the advice given, "in the course of that relationship" (Evid. Code, § 952), there is no requirement that the attorney actually be employed in order to create an attorney-client relationship. Evidence Code section 951 states the prevailing view that a person may discuss a potential legal problem with an attorney for the purpose of obtaining advice or repre-· sentation, and the statements made are privileged whether or not actual employment ensues. (*People v. Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633]; Witkin, Cal. Evidence, *supra*, § 802, pp. 746-747.)

■ The privilege includes only confidential communications. It does not attach to a communication the client does not intend to be confidential. (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 507 [267 P.2d 1025, 268 P.2d 722].) Thus, the communication must be made "in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for .which the lawyer is consulted, ..." (Evid. Code, § 952; *Insurance Co. of North America* v. *Superior Court* (1980) 108 Cal.App.3d 758, 762-763 [166 Cal.Rptr. 880].) Those "who are present to further the interest of the client in the consultation" include a spouse, parent, business associate, joint client or any other person "who may meet with the client and his attorney in regard to a matter of joint concern." (Cal. Law Revision Com. com. to Evid. Code, § 952, 29B West's Ann. Evid. Code (1966 ed.) pp. 528-529; Deering's Ann. Evid. Code (1966 ed.) p. 444.)

■ Real parties in interest present two broad multifaceted arguments as to why no attorney-client privilege existed in the instant case. First, no attorney-client *relationship* existed because: (1) petitioners were not seeking legal advice when they attended the meeting; (2) petitioners' purpose in attending the meeting was not to retain counsel, but instead to secure information in regard to workers' compensation benefits; (3) the attorneys at the time of the meeting did not represent petitioners; and (4) most or all of the disclosures probably concern what the attorneys said to petitioners at the meetings—i.e., since the purpose of the attorney-client privilege is to protect the client so that he is not afraid to disclose all relevant information, the privilege does not encompass comments made only by the lawyer.

■ Second, real parties in interest contend the communications were not *confidential* because: (1) nonessential third parties were present at the meeting, i.e., only 32 of approximately 65 union members joined in this lawsuit; and (2) there was no intent on the part of petitioners to engage in confidential communications.[3]

---

[3]The trial court grounded its discovery order on a perceived lack of confidentiality. It stated, "the union members in the instant case thought they were attending a regular informational union meeting. No safeguards were taken to insure the confidential relationship, and without some understanding or intent on the part of the persons attending the meeting to create a confidential communication, the matter is not privileged. The intent of the attorney that the communication be confidential will not substitute for any lack of intent by the union membership."

Real parties in interest's first argument is not persuasive. First, the evidence shows that at the first meeting petitioners were seeking legal advice on their workers' compensation rights. The fact they received additional advice regarding their potential rights against third parties does not preclude invocation of the privilege. The privilege does not turn on the type of advice sought by the client or given by the attorney. Since petitioners were seeking legal advice, the fact that they did not intend to retain counsel when they went to the meeting or that the attorneys at the meeting did not represent petitioners is irrelevant. As we have already noted, a person may discuss a problem with an attorney for the purpose of obtaining legal advice and this discussion is privileged even though no actual employment ensues. (Evid. Code, § 951; *People* v. *Canfield, supra*, 12 Cal.3d at p. 705.) Nor does the fact that most or all of the relevant disclosures or communications came from the attorneys instead of the client preclude the privilege. Evidence Code section 952 provides in part, "'confidential communication between client and lawyer' means information transmitted *between* a client and his lawyer in the course of that relationship . . . ." (Italics added.) Thus, any communication by the lawyer to the person seeking legal advice is within the privilege.

Real parties in interest's second argument that the communications were not confidential because of the presence of nonessential third parties flies in the face of the record. Mr. Biren's uncontradicted declaration states that the presence of the union members at the meeting was essential for an objective evaluation of the lead poisoning situation at the plant and the rights of the union and its members. The fact that some of the members did not ultimately retain Biren as an attorney does not mean they were nonessential parties at the time the communications took place. All members at the meeting had a common goal—to discuss and receive legal advice concerning their workers' compensation rights against their employer. Thus, all members were "present to further the interest of [each member] in the consultation." (Evid. Code, § 952.) Apparently the possibility of action against third parties arising from the lead poisoning was also discussed at the meeting, again a matter of common concern.

Although no petitioner specifically testified that the communications at the meeting were intended to be confidential (this question apparently was not asked at the depositions), the facts indicate this was a closed meeting with only the local union members and their union attorneys present. It is self-evident that when a union member goes to a closed

union meeting for the purpose of discussing his or her legal rights against the employer, or the employer's suppliers or contractors, for injuries resulting from working conditions on the employer's premises, the member rationally would expect that any statements made concerning the legal problem would remain confidential. The fear of possible employer retribution would compel a reasonable expectancy of privacy on the member's part, particularly where only fellow workers and the union attorneys are present.

Therefore, even assuming Mr. Gonsolus went to the meeting without knowing there would be a discussion about the lead problems at the plant, it should be presumed that a confidential relationship arose when he heard the comments about the lead poisoning and the attorneys' advice thereon.[4] Evidence Code section 917 provides that whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof that the communication was not confidential. Real parties in interest have not met their burden of proof in this regard.

Even in a nonunion context, social conversations between a layperson and an attorney may easily develop into a professional relationship if the conversation turns to serious questions concerning the layperson's legal problem. At this point, both parties reasonably would intend the conversations to be confidential provided the circumstances are otherwise consistent with confidentiality.

Under all of the facts, we hold the communications between petitioners and the union attorneys at the meetings to be within the attorney-client privilege.

Since we recognize the privilege on behalf of petitioners, we need not address the question of whether the union could also assert a similar privilege on behalf of its members.

---

[4] It was suggested at oral argument that we should remand this matter to the trial court with directions to take further evidence on the confidentiality question. This would be a waste of time, since it can be anticipated that if petitioners were asked whether they intended their conversations about the lead poisoning and their legal rights to be confidential, they would all answer in the affirmative.

■ We close by observing that the attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts upon which the communications are based. (*Coy* v. *Superior Court* (1962) 58 Cal.2d 210, 219-220 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678]; *Upjohn Co.* v. *United States* (1981) 449 U.S. 383, 394-397 [66 L.Ed.2d 584, 594-596, 101 S.Ct. 677, 685-686].) Accordingly, we shall issue the writ to foreclose petitioners from being required to answer questions about statements made or legal advice given at the meetings. The writ shall not issue to prevent petitioners from being questioned concerning facts known to petitioners before they attended the meetings or facts, the knowledge of which they acquired between and after said meetings. (See Witkin, Cal. Evidence, *supra*, §§ 794-815, pp. 739-762; *id.* (1982 supp.) §§ 794-815, pp. 342-354; McCormick, Evidence (2d ed. 1972) §§ 87-94, pp. 175-197.)

Let a peremptory writ of mandate issue commanding respondent to vacate its order of October 13, 1981, granting real parties in interest's motion to compel answers at depositions and commanding respondent trial court to enter an order denying real parties in interest's motion insofar as it seeks to compel answers to questions concerning privileged communications and events which transpired at the 1976 union meetings.

Zenovich, J., and LaRue, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.