[No. F006300. Fifth Dist. May 29, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN FLORES VELASQUEZ, Defendant and Appellant.

320

COUNSEL

Catherine Aragon, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Joel Carey and Ellen M. Peter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MARTIN, J.—Appellant, John Flores Velasquez, was charged by information with the murder of Andrew Jackson White in violation of Penal Code section 187[1] (count one) which further alleged the murder was committed while appellant was engaged in the commission of a burglary pursuant to section 190.2, subdivision (a)(17)(vii). It was also alleged in connection with count one that appellant had used a deadly weapon, i.e., a hammer, in the commission of the murder pursuant to section 12022, subdivision (b). Appellant was further charged with burglary in violation of sections 459 and 460 (count two) and robbery in violation of sections 211 and 213.5 (count three). For each count, the information contained an allegation the crimes were committed against a victim over 60 years of age who sustained great bodily injury. (§ 1203.09.)

The information was later amended to add a second special circumstance which alleged the murder was committed while appellant was engaged in the

---

[1]All statutory references are to the Penal Code unless otherwise specified.

commission of a robbery (§ 190.2, subd. (a)(17)(i)). An enhancement allegation that appellant used a deadly weapon, a hammer, was added to counts two and three (§ 12022, subd. (b)).

After trial, a jury reached the verdict of guilty as to each count and found each special circumstance and enhancement allegation to be true. The jury imposed upon appellant a period of confinement in state prison consisting of life without the possibility of parole. This appeal followed.

## FACTS

On September 22, 1984, at midafternoon, appellant and his brother, Benny Velasquez, went to the home of Yolanda Villa. About an hour later, appellant left and entered the homes of three of Villa's neighbors without their consent. At approximately 4:15 p.m., one of those neighbors, Bernice Lopez, approached Yolanda Villa and complained a man had been in her home and had taken her wallet. Lopez asked whether Villa had seen him. Lopez's son responded the man was now in Villa's home. Lopez entered Villa's home and retrieved her wallet from appellant who was sitting at a table. Appellant did not resist and Lopez departed.

At approximately 7 p.m. that same day, 80-year-old Andrew Jackson White and his wife, Florence, were sitting at a picnic table in the yard of their home in Fresno, California. Appellant approached the table and snatched Mrs. White's purse. Mr. White retrieved the purse and appellant left. A neighbor, Barbara Rhein, observed appellant's unsuccessful attempt to steal Mrs. White's purse and his departure. She continued to watch and saw appellant return and enter the White home through the front door. She shouted to the Whites that he had entered the house and she called the sheriff's department. The Whites entered their home and confronted appellant. Mr. White ordered appellant out of the house and he left by the back door. Mr. White told his wife to telephone the police. Mrs. White went to her neighbor, Sherry Foster, and asked her to call the police. Then Ms. Foster heard breaking glass and saw a dark-haired man, not Mr. White, at the sink inside the Whites' home.

Sheriff's Deputies Tom Leband and David Rios arrived in response to the call from Ms. Rhein. They entered the White residence and found Mr. White lying in a pool of blood in the living room. A blood-covered hammer was on the floor. Appellant was discovered in the bedroom going through a dresser drawer. Protruding from his pocket were about a dozen knives from the Whites' kitchen. Inside his pockets, the deputies found money, a watch, necklace, and broken pieces from the Whites' piggybank. The deputies did not observe appellant stumbling nor swaying as he walked out of the house.

When appellant exited the house, the deputies spread-eagled him face down on the grass. They handcuffed him and removed the knives from his pocket. The officers found no other weapons during their pat-down search.

Appellant was placed in a patrol car guarded by Deputy Rios. Appellant said to Rios: "Officer, officer, did the man die? I hope not, I swear to God, I did not know what I was doing." After a pause, appellant further stated: "You guys are in fuckin' trouble [pause] you mother fuckers. I have had it and I did not even do nothing. . . . You guys were dispatched to the wrong fuckin' call. I ain't got no mother fuckin' weapons, I ain't got shit. [Pause] Sir, did the dude die: Did the guy die?"

Sheriff's Deputy Glass took custody of appellant from Deputy Rios at approximately 10 p.m. The appellant had been asleep in the patrol car for about one hour and had to be awakened in order to be transferred to custody under Deputy Glass. Glass testified he noticed appellant appeared to be intoxicated and under the influence of some type of narcotic. Glass detected the odor of alcohol on appellant's breath and appellant's speech was slurred.

In the interim, Mr. White was transported by ambulance to a local hospital. His head had been struck approximately 20 times. He died seven days later from these head injuries.

At appellant's trial, Mario Robles, who had been arrested and placed in the Fresno County jail for assault with a deadly weapon and attempted kidnapping on January 3, 1985, testified to his conversations and relationship with appellant during his period of incarceration. The day after he was placed in the Fresno County jail, Robles met appellant, who was a trustee inmate and therefore could circulate between the cells. Appellant, without prompting, discussed his case with Robles.

Robles had been previously incarcerated for a total of 11 years but had never represented himself at trial, only in pretrial proceedings. During this 1985 period of incarceration, Robles received pamphlets from an ex-offender organization entitled Inside/Out. Using the Inside/Out information and advice from a disbarred attorney who was also in custody, Robles filed a writ of habeas corpus on his own behalf. Robles showed appellant the pamphlet which contained a sample writ regarding the discharge of one's own lawyer. Appellant asked Robles to fill out the form for him.

During the course of their discussions, appellant first informed Robles he did not remember the murder. Subsequently, he told Robles he did in fact remember and had fooled the psychiatrist.

On April 3, 1985, Robles learned the victim was an 80-year-old man. The following day, Robles wrote a letter to the district attorney's office suggesting an interview regarding appellant's case.

On April 10, 1985, Robles was interviewed by personnel from the district attorney's office and the conversation was tape recorded. No one requested Robles to speak with appellant or gather information against appellant. No promises of leniency were ever made to Robles.

Dr. Ronald Segel, a psychopharmacologist, testified as to the effects of drugs on behavior. In reviewing all of the material and documents available in regard to this case, prior to his testimony, Dr. Segel testified the words, statements, and conduct of appellant reflected very little PCP-related effect.

### DEFENSE

Appellant testified he usually smoked PCP two to three times each week. However, on September 22, 1984, the day of the assault on Mr. White, he used heroin. Appellant's brother and Roosevelt DeLeon, a resident of appellant's apartment building, testified appellant was "high" on September 22, 1984. Between 6 and 7 p.m. on the date in question, appellant requested DeLeon drive him to get a "fix." DeLeon refused.

Appellant testified he did not remember anything from the time he consumed the heroin until he woke up in the back seat of the police car.

Appellant testified he met Robles while serving as a trustee in the jail. Robles said he had been poorly represented by the public defender in his own murder trial and suggested appellant file a motion to dismiss the public defender. Appellant indicated he did not have the education to fill out the writ form and Robles filled it out for him. Appellant denied talking to Robles about any other part of his case. Appellant claimed he only asked Robles to help him discharge the public defender.[2] He denied disclosing any information about contriving a diminished capacity defense.[3] Appellant testified he told Robles he did not remember very much of what happened the day of the murder.

---

[2] The public defender represented appellant during the preliminary hearing. On January 8, 1985, appellant made a motion pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] for appointment of other counsel. On January 11, 1985, an in camera hearing was held on the motion, and it was denied. The public defender was reappointed to represent appellant on January 14, 1985. On June 3, 1985, appellant substituted retained counsel for the public defender.

[3] Respondent notes that if there were no communication to Robles about appellant's defense then the nonexistent communication cannot be confidential.

For the defense, Dr. Paul Levy, a psychiatrist, testified that on the information available it was his opinion appellant was not acting in a reasonable, normal manner on the day in question and that he was under the influence of some kind of toxic substance which might well have been PCP.

DISCUSSION

WHETHER THE ATTORNEY-CLIENT PRIVILEGE APPLIES TO COMMUNICATIONS BETWEEN "JAILHOUSE LAWYERS" AND THEIR INMATE "CLIENTS"

At the time of these proceedings, charges were still pending against Robles with the possibility that, upon conviction, Robles could receive a 10-year sentence.

While incarcerated, Robles became acquainted with appellant. Robles testified he did not do any reading or studying on the law while in state prison; however, when arrested in February of 1985, he began reading law books and pamphlets. Evidence was presented that Robles filed seven writs with the Fresno County Superior Court using appropriate federal and state citations. There is no indication in the record that these writs were filed on behalf of anyone other than Mario Robles.

Due to his personal experience with the Fresno County Public Defender's Office, he advised other prisoners not to utilize the public defender's office. In February of 1985, Robles advised appellant to discharge the public defender. Appellant felt unable to complete the paperwork to do so and, upon appellant's request, Robles prepared a petition to dismiss the public defender for him.

According to Robles's testimony, appellant informed Robles he was charged with first degree murder with special circumstances and asked Robles to research the law regarding a diminished capacity defense for him. Appellant said he hoped to get his charges dropped to second degree murder or less. Robles told appellant that in order to do the legal research, appellant must tell Robles everything that happened. Therefore, appellant admitted to Robles he had killed a man by beating him on the head with a hammer an unknown number of times; this occurred in the living room of the house he had entered in an attempt to obtain money or something to sell in order to purchase drugs. Appellant described the scene to Robles telling him there was blood on the carpet, walls and ceilings. Appellant said he had fooled the psychiatrists and other people by telling them he did not remember the crime.

Robles further testified that when he initially talked to appellant, he had no intention of revealing any information to the district attorney, but decided to do so when he learned the deceased had been an 80-year-old man.

## I.

### PRIVILEGE BASED ON STATUTE

■ Appellant contends the attorney-client privilege applies to communications between "jailhouse lawyers" and their inmate "clients" both by express statute and impliedly based on statute.

Section 952 of the Evidence Code provides: "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

Section 950 of the Evidence Code defines "lawyer" as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation."

As codified in Evidence Code section 950 et seq., the lawyer-client privilege, when properly claimed, protects against disclosure of any "confidential communication between client and lawyer," a term defined to include "information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information . . . ." (Evid. Code, § 952.)

We have not found, and the parties have not cited, any California case specifically addressing this question. Nor could any state or federal authority be located which recognized an attorney-client privilege between a "jailhouse lawyer" and his inmate "client." The idea was summarily rejected in *People v. Barber* (1983) 116 Ill.App.3d 767 [452 N.E.2d 725, 731] (a case which involved a nearly identical factual situation); and the idea of a pseudo attor-

ney-client privilege for "jailhouse lawyers" was also rejected in *Mitchell* v. *Carlson* (D.Kan. 1975) 404 F.Supp. 1220, 1223-1224.

Evidence Code section 911 states the general rule: "*Except as otherwise provided by statute:*

"(a)   No person has a privilege to refuse to be a witness.

"(b)   No person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing.

"(c)   No person has a privilege that another shall not be a witness or shall not disclose any matter or shall not produce any writing, object, or other thing." (Italics added.)

■   In enacting section 911 of the Evidence Code, the Legislature clearly intended to abolish common law privileges and to keep the courts from creating new nonstatutory privileges as a matter of judicial policy. (Evid. Code, § 12, subd. (c); *Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766, 769 [190 Cal.Rptr. 919, 661 P.2d 1073, 31 A.L.R.4th 1214].)

■   The attorney-client privilege is based on grounds of public policy and is in furtherance of the proper and orderly administration of justice. The privilege is a statutory creation, embodied in Evidence Code section 950 et seq., and an exception to the general rule requiring disclosure. (See Evid. Code, § 911.) "The objective of making a particular communication privileged is to encourage a client to make a complete disclosure to his attorney without fear that others may also be informed. [Citations.]" (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 506-507 [267 P.2d 1025], disapproved on other grounds in *Suezaki* v. *Superior Court* (1962) 58 Cal.2d 166, 176 [23 Cal.Rptr. 368, 373 P.2d 432, 95 A.L.R.2d 1073].) As an obstruction to the search for all relevant information, the privilege is to be strictly construed. (*City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.2d 1418].)[4]

---

[4]Appellant relies on *Benge* v. *Superior Court* (1982) 131 Cal.App.3d 336 [182 Cal.Rptr. 275] for the proposition that the attorney-client privilege is to be liberally construed in favor of the exercise of the privilege. *Benge* involved the question of whether the members of a local chapter of a union at a meeting with the attorneys retained by the union were protected by the attorney-client privilege as to the discussions which occurred during the course of the meeting. This court concluded those communications were in fact privileged. The apparent contradiction between whether the attorney-client privilege should be strictly construed or liberally construed appears to be that in attempting to establish an attorney-client relationship, or where the relationship is not clearly established, the privilege is to be strictly construed. (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d 227, 234.) But where the relationship has been established, the basic policy behind the attorney-client privilege to promote the relationship by safeguarding the confidential disclosures of the client and the advice given by the attorney, then the policy supports a liberal construction in favor of the exercise of the privilege. (*Benge* v. *Superior Court, supra,* 131 Cal.App.3d 336, 344.) However, on its facts, *Benge* is clearly distinguishable from the instant case.

The burden is on the party claiming the existence of the privilege to show that it should be protected. (*Tanzola* v. *De Rita* (1955) 45 Cal.2d 1, 6 [285 P.2d 897]; *Mahoney* v. *Superior Court* (1983) 142 Cal.App.3d 937, 941 [191 Cal.Rptr. 425].)

Furthermore, the passage of Proposition 8 in 1982 added a constitutional requirement to admit all relevant evidence in criminal proceedings. (Cal. Const., art. I, § 28, subd. (d).) One of the few exceptions to this broad mandate is the preservation of "any existing *statutory* rule of evidence relating to privilege or hearsay. . . ." (*Ibid.*, italics added.)

In the instant case, appellant failed to meet his burden of showing the existence of an attorney-client relationship. To come within the privilege, appellant would have had to believe he was talking to a lawyer or a person he reasonably believed to be a lawyer. However, appellant never testified, either at trial or the pretrial hearing on the motion to exclude Robles from testifying, that he believed Robles was an attorney. Rather, he testified he never discussed diminished capacity or the circumstances of his case with Robles. Thus, the trial court correctly determined no attorney-client relationship existed and, therefore, no attorney-client privilege existed as to conversations between the appellant and his fellow inmate.

In *Johnson* v. *Avery* (1969) 393 U.S. 483 [21 L.Ed.2d 718, 89 S.Ct. 747], the high court recognized "jailhouse lawyers" serve an important function in the prison system; however, nowhere in the opinion does the court elevate a "jailhouse lawyer" to that of an attorney-at-law with the attendant responsibilities, burdens and privileges.

Appellant relies on *Welfare Rights Organization* v. *Crisan, supra,* 33 Cal.3d 766 as support for his contention the attorney-client privilege is extended to communications between "jailhouse lawyers" and their inmate "clients" *impliedly* by statute.

In that case, the California Supreme Court held the attorney-client privilege applied to communications between welfare claimants and their lay representatives authorized by Welfare and Institutions Code section 10950 to represent them in administrative hearings under the aid to families with dependent children program. (*Id.* at p. 769.) To hold otherwise would create a "trap" by inducing confidential communication and then allowing those communications to be used against the claimant. (*Id.* at p. 771.)

The fundamental distinction between the facts before the court in *Welfare Rights Organization* v. *Crisan, supra,* and the instant case is the statute expressly authorizing lay representatives to represent the welfare claimants

at the administrative hearings. This inducement to use lay representation (and thereby lay the foundation for a "trap") is absent here. While use of "jailhouse lawyers" is not prohibited, it is not encouraged or promoted by state action; nor are such communications privileged.

## II.

### RIGHT TO COUNSEL AND SELF-INCRIMINATION

■ Appellant argues a denial of the attorney-client privilege to "jailhouse lawyers" and their "clients" has the effect of denying the inmate of his constitutional rights to counsel and immunity from self-incrimination. This argument is best addressed to the Legislature. Moreover, appellant's right to counsel was never violated in this case. A public defender was appointed for him at arraignment and he later petitioned the court to have the public defender removed. The petition was denied and the public defender was reappointed. Appellant ultimately retained counsel to defend him. Thus, he was represented by counsel at all critical stages of these proceedings. As stated earlier, there was no privilege which attached to the communication between appellant and Robles. ■ The admission of Robles's testimony did not violate appellant's Fifth or Sixth Amendment right in that Robles was not a paid informant and was not deliberately placed in appellant's cell to elicit incriminating evidence. The trial court found there was no evidence to establish Robles was an agent of law enforcement and this finding is amply supported by the record. (See *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].) Appellant's statements to Robles, being completely voluntary in nature, were admissible. On the same rationale, appellant's voluntary statements were therefore not obtained in violation of his Fifth Amendment right against self-incrimination.

## III.

### EQUAL PROTECTION

■ Appellant contends a denial of the attorney-client privilege to "jailhouse lawyers" and their inmate "clients" violates the prisoner's federal and state guaranties of equal protection. This argument assumes inmates with "jailhouse lawyers" are similarly situated to inmates with formal legal assistance. Again, appellant ignores the fact he had qualified counsel throughout these proceedings.

The equal protection clause directs that "all persons similarly circumstanced shall be treated alike." (*F. S. Royster Guano Co.* v. *Commonwealth of Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 991, 40 S.Ct. 560, 562];

*People* v. *Romo* (1975) 14 Cal.3d 189, 196 [121 Cal.Rptr. 111, 534 P.2d 1015].) However, the "Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." (*Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 130 A.L.R. 1321].) Despite appellant's contention to the contrary, criminal defendants awaiting trial who have appointed counsel and choose to make incriminating statements to fellow inmates are not similarly situated with criminal defendants who are surreptitiously and deliberately induced by an agent of the state to confess nor are they similarly situated with a criminal defendant whose incriminating communications to his retained or appointed counsel are protected by the statutory attorney-client privilege. (*People* v. *Arauz* (1970) 5 Cal.App.3d 523, 530-531 [85 Cal.Rptr. 266], disapproved on other grounds in *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 716 [135 Cal.Rptr. 392, 557 P.2d 976]; *People* v. *Wright* (1966) 245 Cal.App.2d 265, 269-270 [53 Cal.Rptr. 844].)

## IV.

### PREJUDICIAL EFFECT

As has been explained, no violation of an attorney-client privilege, statutory rights or constitutional rights has occurred in this case. Therefore, as no error occurred, there is no need to determine whether appellant was prejudiced.

The judgment is affirmed.

Hamlin, Acting P. J., and Ballantyne, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 24, 1987.