13 P.3d 781

**STATE of Arizona, Appellee,**

v.

**Stephen Timothy FOSTER, Appellant.**

**No. 1 CA–CR 99–0518.**

Court of Appeals of Arizona, Division 1, Department D.

Nov. 30, 2000.

Janet Napolitano, Attorney General by Paul J. McMurdie, Chief Counsel Criminal Appeals Section and James P. Beene, Assistant Attorney General, Phoenix, Attorneys for Appellee.

J. Douglas McVay, Phoenix, Attorney for Appellant.

OPINION

THOMPSON, Judge.

¶ 1 Stephen Timothy Foster (defendant) appeals his conviction on one count of first-

degree murder and the natural life sentence imposed. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. The Murder

¶ 2 On the morning of November 8, 1995, defendant began moving his belongings into a Phoenix apartment occupied by his friend Jesse, Jesse's girlfriend Kerrie, Kerrie's infant daughter, and another friend. Defendant and Kerrie were involved in a sexual relationship, and Kerrie was opposed to defendant living in the apartment she shared with Jesse. While defendant was moving his belongings into the apartment, Kerrie confronted him, demanding to know why he was still there. As she had on previous occasions, Kerrie threatened to tell Jesse about her sexual relationship with defendant. Frightened of how Jesse would react when Jesse learned that he and Kerrie were sexually involved, defendant decided to kill Kerrie before she could speak to Jesse. Taking a large knife from the kitchen, he followed Kerrie to her bedroom, where he proceeded to stab her multiple times. Jesse and Charles were both at work when the murder occurred. Kerrie's infant daughter, however, was asleep in the bedroom during the attack.

¶ 3 After stabbing Kerrie approximately forty times, defendant placed her body in the bathtub. He then changed his clothing, which had become stained with blood during the attack. Before leaving, he removed some items from the apartment in an attempt to make the incident look like a botched burglary.

¶ 4 Defendant returned to the apartment later that morning. This time, he brought his girlfriend with him under the pretext of having her help him move his belongings into the apartment. Upon "discovering" the burglary and finding "blood all over the place," defendant ran from the apartment and began knocking on neighbors' doors. When no one answered, he called 911 and reported the burglary and the presence of blood in the apartment. When defendant's girlfriend asked about Kerrie's baby, defendant went back to the apartment to get the child. When he returned, he informed his girlfriend that Kerrie was lying in the bathroom covered in blood. Defendant's girlfriend then called 911 to report this information.

### B. Defendant's Confession

¶ 5 Defendant was on parole at the time of Kerrie's murder, and his contact with the police as a possible suspect in the murder constituted a violation of the terms of his parole. His parole officer therefore returned him to Arizona Department of Corrections (D.O.C.) custody. Defendant was held at the Perryville facility. Soon after arriving at Perryville, he came in contact with Nicholas D'Martini, an inmate he had known during his prior incarceration. D'Martini was a "legal representative" who assisted other inmates in initiating civil lawsuits, filing petitions for post-conviction relief, and preparing "parole packets." D'Martini had previously assisted defendant in preparing a parole packet when both men were incarcerated at another prison facility.

¶ 6 Defendant informed D'Martini that he had been returned to D.O.C. custody because he was the "primary suspect" in a murder. He asked D'Martini if he was "still doing work," and he indicated that he might need D'Martini's assistance in preparing for his parole violation hearing. D'Martini agreed to help defendant, and the two men proceeded to spend numerous hours over the following four or five days discussing defendant's involvement in Kerrie's murder. During these meetings, defendant confessed to D'Martini that he murdered Kerrie. D'Martini took extensive notes of defendant's statements. Eventually, he convinced defendant to put his confession in writing and to have the writing notarized, persuading him that a written confession might help him "make a deal" with the prosecutors in the event that the state sought the death penalty. Defendant's former D.O.C. roommate, Chris Bright, was present during some of the meetings in which defendant admitted his role in Kerrie's death.

### C. Defendant's Trial and Conviction

¶ 7 Seeking to use the information regarding defendant to accelerate his own release

from prison, D'Martini promptly disclosed defendant's confession to the Phoenix Police Department. The state subsequently indicted defendant for first-degree murder. Relying on the Arizona Supreme Court's decision in *State v. Melendez,* 172 Ariz. 68, 834 P.2d 154 (1992), defendant moved to suppress all oral and written statements he made to D'Martini, arguing that admission of the statements at his trial would violate his right to due process under both the United States and Arizona constitutions. Following an evidentiary hearing, the trial court denied the motion, concluding that no attorney-client privilege existed between D'Martini and defendant. The court observed "that the defendant got what he paid for, free advice, and therefore, worthless."

¶ 8 A jury convicted defendant of the charged offense, and the trial court subsequently imposed a prison term of natural life. Defendant timely appealed his conviction and sentence to this court.

## DISCUSSION

¶ 9 Defendant's sole argument on appeal is that the trial court erred in denying his motion to suppress his statements to D'Martini.[1] Specifically, he argues that the trial court erred in failing to conclude that preclusion of his statements to D'Martini was mandated by the Arizona Supreme Court's decision in *State v. Melendez.* 172 Ariz. 68, 834 P.2d 154. Because we are called upon to resolve the purely legal issue of whether *Melendez* applies to the undisputed facts of this case, we review the trial court's ruling *de novo. See State v. Valenzuela,* 182 Ariz. 632, 898 P.2d 1010 (App.1995)(when review of grant or denial of motion to suppress involves solely a question of law, appellate court reviews trial court's ruling *de novo* ).

¶ 10 Like this case, *Melendez* involved a defendant's motion to suppress inculpatory statements he made to a "jailhouse lawyer." The victim in *Melendez* was a state prison

inmate. 172 Ariz. at 69, 834 P.2d at 155. Melendez, who was also an inmate, was a suspect in the murder. *Id.* While the murder investigation was proceeding, D.O.C. personnel formally charged Melendez with an administrative violation for intentionally causing the victim's death, and notified him that he was to face a hearing before the prison disciplinary committee. *Id.*

¶ 11 Pursuant to D.O.C. regulations, inmates accused of serious disciplinary violations, including homicide, were entitled to representation by a retained attorney or, if unable to afford an attorney, by a willing staff member or fellow inmate. 172 Ariz. at 69, 834 P.2d at 155. D.O.C. gave Melendez a form notifying him of these rights. *Id.* at 69–70, 834 P.2d at 155–56. In addition, Melendez was required to complete a form identifying the person whom he wished to "appoint . . . as [his] representative." *Id.* at 70, 834 P.2d at 156.

¶ 12 Melendez selected an inmate, William Plew, to represent him, and he and Plew met to discuss and prepare his defense. *Id.* Because Melendez was transferred to another facility before his disciplinary hearing, Plew did not ultimately represent him at the hearing. *Id.* Plew, however, proceeded to inform the state of inculpatory statements Melendez made regarding his involvement in the murder. *Id.* The state, in turn, sought to use the information it obtained from Plew at Melendez's criminal trial. *Id.* Melendez moved to suppress Plew's testimony, arguing that it violated the attorney-client privilege, as well as his rights under the Fifth, Sixth, and Fourteenth amendments to the United States Constitution and article 2, section 4 of the Arizona Constitution. *Id.* The trial court granted the motion to suppress and the state appealed. *Id.*

¶ 13 The Arizona Supreme Court affirmed the trial court's suppression of Plew's testimony. Relying solely on the due process

---

1. In his brief, defendant also raises a challenge to the *Portillo* reasonable doubt instruction given at his trial. *See State v. Portillo,* 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995); *see also State v. Van Adams,* 194 Ariz. 408, 417–18, ¶¶ 29–30, 984 P.2d 16, 25–26 (1999), *cert. denied,* 528 U.S. 1172, 120 S.Ct. 1199, 145 L.Ed.2d 1102 (2000).

He recognizes, however, that this Court has no authority to overrule a decision of the Arizona Supreme Court. *See Myers v. Reeb,* 190 Ariz. 341, 342, 947 P.2d 915, 916 (App.1997). Rather, he raises the issue solely for the purpose of preserving it in the event of further appellate review.

clause of the Arizona Constitution, the court held that permitting the state to introduce testimony garnered from communications between Melendez and his "formal inmate representative would, under the circumstances, be fundamentally unfair and thus a deprivation of due process." 172 Ariz. at 71, 834 P.2d at 157. Critical to the court's reasoning was the fact that D.O.C.'s formal policies "induced" prisoners to use inmate legal representatives in disciplinary proceedings and that Melendez had "secured [Plew's] representation through formal institutional procedures." *Id.* at 72–73, 834 P.2d at 158–59. That is, pursuant to D.O.C. procedures, inmates who were the subject of disciplinary proceedings for alleged serious violations were told that they had the right to "assistance of a willing and available prisoner in [their] institution . . . to aid and assist [them] in [their] defense." *Id.* at 70, 834 P.2d at 156. The inmates were then required to notify D.O.C. of the name of the inmate whom they wished to "appoint" as their "representative." *Id.* The court identified D.O.C.'s "inducement to use lay representation" as the "heart" of Melendez's due process claim, noting that the "right" to inmate representation would be nothing more than a "trap" if it induced confidential communications and then allowed them to be used against the defendant. *Id.* at 72, 834 P.2d at 158 (quoting *Welfare Rights Org. v. Crisan,* 33 Cal.3d 766, 190 Cal.Rptr. 919, 661· P.2d 1073, 1076–77 (1983)).

¶ 14 Defendant submits that the rationale of *Melendez* applies equally to his relationship with D'Martini. He notes that D'Martini was "certified" by D.O.C. to act as an inmate legal representative. In that capacity, D'Martini had considerable access to other inmates and was permitted to meet with those inmates for extensive periods of time to provide legal assistance. According to defendant, "[t]here is no question that but for the certification which the State granted to D'Martini and the specific authorization which the State granted to D'Martini to represent/ advise [him], D'Martini would never have been in a position to betray [his] trust."

¶ 15 We are not persuaded, however, that D.O.C.'s imprimatur on D'Martini's role as an inmate legal representative implicates the same fundamental fairness concerns that were at issue in *Melendez.* *Melendez* holds that it is a violation of due process to *induce* an inmate to obtain inmate legal representation and then to permit his subsequent communications with the legal representative to be used against him. 172 Ariz. at 72, 834 P.2d at 158. Absent from the case before us is any indication that D.O.C. induced defendant to seek legal advice or representation from another inmate. For example, unlike the defendant in *Melendez,* D.O.C. did not inform defendant that he had the right to inmate representation in preparing for his parole violation hearing. Rather, he was told only that he had the right to be represented by an attorney at his own expense. When informed of his rights with regard to his parole violation hearing, defendant was not told that he could obtain the legal representation or assistance of another inmate. Moreover, unlike in *Melendez,* D'Martini would not have been permitted to represent or advise defendant at his parole violation hearing.

■ ¶ 16 Although the record indicates that D.O.C. permitted D'Martini to act as an inmate legal representative, merely regulating who may assist inmates in legal matters does not equate with *inducing* prisoners to seek legal representation from those inmates. *People v. Velasquez,* 192 Cal.App.3d 319, 237 Cal.Rptr. 366, 371 (1987) (no inducement where, although use of jailhouse lawyers was not prohibited, it was neither encouraged nor promoted by state action). The state has the authority to regulate the activities of inmate legal representatives. *Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). D.O.C. did no more than that when it accepted D'Martini's application to act as a. legal inmate representative and permitted him to meet with defendant. No evidence in the record suggests that the state encouraged or induced defendant to seek D'Martini's counsel. Thus, the "heart" of the due process violation in *Melendez* is absent in this case. *See Melendez,* 172 Ariz. at 72, 834 P.2d at 158. Accordingly, we find no error in the trial court's denial of defendant's motion to suppress his statements to D'Martini. We also note that, even if evidence of D.O.C.

inducement existed in this case, defendant's actions toward D'Martini belie his claim that he intended their conversations to be privileged and confidential. Defendant's former roommate, Chris Bright, was with him during some of his meetings with D'Martini in which he admitted that he murdered Kerrie. Bright's invited presence at those meeting was plainly inconsistent with an intent on defendant's part to engage in confidential communications with D'Martini.

## CONCLUSION

¶ 17 We hold that the trial court properly denied defendant's motion to suppress. Because defendant raises no other issues on appeal, we affirm his conviction and sentence.

CONCURRING: CECIL B. PATTERSON, Jr., Presiding, Judge, and SUSAN A. EHRLICH, Judge.

