Filed 3/12/14

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SEAHAUS LA JOLLA OWNERS ASSOCIATION,<br><br>          Petitioner,<br><br>          v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>          Respondent;<br><br>LA JOLLA VIEW LTD., LLC et al.,<br><br>          Real Parties in Interest. | D064567<br><br>(San Diego County<br>Super. Ct. No. 37-2009-00095253-CU-CD-CTL; No. 37-2010-00092634-CU-IC-CTL) |


Petition for writ of mandate after superior court (Hon. John S. Meyer) granted motion to compel discovery responses over Petitioner's assertion of attorney-client privilege.  Petition granted.

Epsten Grinnell & Howell, Anne L. Rauch; Rockwood & Noziska, Brant Noziska, Neal Rockwood; Law Offices of William A. Bramley and William A. Bramley for Petitioner.

Simpson Delmore & Greene, Paul J. Delmore, Elizabeth A. Donovan and Brook T. Barnes for Real Parties in Interest CLB Partners Ltd. and La Jolla View Ltd., LLC.

Gordon & Rees, Sandy M. Kaplan, R. Scott Sokol and Matthew G. Kleiner for Real Parties in Interest Webcor Development, Inc., Webcor Builders, Inc. and Webcor Construction, L.P.

Bryan Cave, Robert E. Boone III, Edward M. Rosenfeld, Tony Tootell and David Harford for Real Parties in Interest Bank of America Corporation, Bank of America, N.A. and Countrywide Home Loans, Inc.

Petitioner Seahaus La Jolla Homeowners Association (Association) is the plaintiff in a construction defect action alleging water and other damage to the common areas of a common interest development. The Association sued the developers and builders of the complex, La Jolla View Ltd., LLC et al. and Webcor Construction L.P. (Defendants), who, among others, are the real parties in interest in this mandamus proceeding. The Association contends the trial court erred and abused its discretion in overruling the Association's claim of attorney-client privilege in this discovery dispute over Defendants' efforts to depose individual homeowners regarding disclosures made at informational meetings about the litigation.

The record shows that counsel for the Association's board of directors (the Board) gave notice to the individual homeowners in June 2009 that the Board was pursuing mediation but was also contemplating filing construction defect litigation. (Former Civ. Code, § 1368.5; now see Civ. Code, § 6150.)[1] Such litigation was filed in July of 2009, and the Board and its counsel subsequently conducted meetings with many individual homeowners of the 140 units, to apprise them of the status and goals of the litigation. Pursuant to the provisions of the governing documents, at one such litigation update meeting, the Board sought and obtained majority approval by the homeowners for pursuing the action. (Civ. Code, § 6150, subd. (b); Association's Declaration of Covenants, Conditions and Restrictions (CCRs), § 4.4.11, "Members' Approval of Certain Actions.")

By the time of the later litigation update meetings, a subgroup of individual homeowners had filed its own companion action in which they seek damages for construction defects in their private individual units, and their action was coordinated for

---

[1]     Both former Civil Code section 1368.5 and current Civil Code section 6150 are provisions contained in the Davis-Stirling Common Interest Development Act (the Act), which was recently repealed, reenacted and renumbered by Statutes 2012, chapter 180, section 1, operative January 1, 2014; now see Civil Code section 4000 et seq. on residential properties, and Civil Code section 6500 et seq. for commercial and industrial properties. We utilize the current Civil Code section designations. The Association is a nonprofit mutual benefit corporation managing the common interest development.

discovery purposes with the Association's action. (*Sarnecky v. La Jolla View Ltd., LLC* (Super. Ct. San Diego, 2010, No. 37-2010-00092634-CU-IC-CTL)) (*Sarnecky* action).)[2]

Defendants' contested discovery requests were made during depositions of many individual homeowners, and seek to inquire into the content and disclosures made at those informational litigation update meetings, which were conducted by the Association's counsel. The Association objected, invoking the attorney-client privilege under Evidence Code[3] section 952 and the "common interest" doctrine. (See *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 887-888 (*OXY Resources*) [parties who possess common legal interests may share privileged information without losing the protection afforded by the privilege].) However, several rulings by the trial court have declined to allow such a privilege to be asserted by the Association, or have concluded any privilege was waived, regarding the communications received at the meetings by individual homeowners who are not the actual clients of the Association's retained counsel. This petition ensued.

"Confidential communications" between client and lawyer are defined in section 952 as meaning "information transmitted between a client and his or her lawyer in the

---

[2]     The *Sarnecky* action was brought by a group of approximately 30 unit homeowners against not only the developers and builders, but also the lenders and escrow holders. One real party in interest here, defendant Bank of America, was never sued in this Association action, but only in the individual homeowners' coordinated action. Bank of America recently obtained summary judgment in the *Sarnecky* action and has notified this court that it is no longer a real party in interest and will not be filing a return. However, its previous filings were properly before this court, and have been relied on by the other real parties in interest, and may be considered here.

[3]     All further statutory references are to the Evidence Code unless noted.

4

course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to *no third persons other than those who are present to further the interest of the client in the consultation* **or** *those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted*, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Italics and emphasis added.)

We evaluate this discovery dispute in the context of the usual first principles, that parties may obtain discovery regarding any unprivileged matter that is *relevant* to the subject of the pending action, or motions, but subject to the rule that "the matter either is itself admissible in evidence *or appears reasonably calculated to lead to the discovery of admissible evidence*." (Code Civ. Proc., § 2017.010, italics added.) Defendants' claim to entitlement to information about the litigation update meetings is apparently based upon the claim of some of the individual plaintiffs to stigma damages for their units (apparently in the *Sarnecky* action). Defendants argue that in the Association's common area action, they should be able to inquire into the beliefs of the individual homeowner plaintiffs about damages and the source of their beliefs (such as any perceptions gained from information given to them by the Association's attorneys at the Board's litigation update meetings).

To the extent this record reveals anything about the purpose of the requested discovery, it shows that counsel for Defendants is seeking to develop information about the litigation strategy of the Association's counsel, including the legal opinions formed

5

and the advice given by the lawyers in the course of that relationship, and such disclosures would not likely lead to the discovery of admissible evidence. (§ 952; Code Civ. Proc., § 2017.010; *Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 609-610 (*Mitchell*) [public policy concerns outlined against unwarranted invasions of privilege].)

In the Act governing common interest developments, the Legislature placed certain obligations on homeowners' association governing boards to communicate with individual owners about proposed construction defect litigation by the Association regarding the common areas. (Civ. Code, § 6150, subd. (a).) The Association may sue developers over common area defects, and also over alleged damage to the separate interests that the Association must maintain or repair, or damage to the separate interests that is integrally related to damage to the common areas. (*Ibid.*; Civ. Code, § 5980.) By the same token, individual owners have economic interests in the value of not only their own individual units, but also in the state of the development as a whole. (*Ostayan v. Nordhoff Townhomes Homeowners Assn., Inc.* (2003) 110 Cal.App.4th 120, 126-127 (*Ostayan*).)

As we will show, the challenged orders in the Association's action represent an overly technical definition of the attorney-client privilege, and do not account for the protection of client confidentiality as it operates through the common interest doctrine, in this factual and legal context surrounding common interest developments. We grant relief on the petition to allow the attorney-client privilege to be asserted under these circumstances.

6

FACTUAL AND PROCEDURAL SUMMARY

A.  *Nature of Meetings Held by Board for Individual Homeowners; Legal Representation*

The Association's Board hired the Epsten Grinnell & Howell law firm to represent it in pursuing mediation with the developer and general contractor of the development. On June 23, 2009, the Association's counsel sent a letter to all homeowners notifying them that mediation was pending, no lawsuit had been filed, and a preliminary list of defects was enclosed, reflecting that the Association was currently investigating the nature, extent and severity of the defects at the site.  The letter stated that if an owner was selling or refinancing a unit, "you may be required to provide this document to escrow, buyer, or a lending institution."

The next letter from the Association's attorneys was dated August 17, 2009, and provided homeowners with an update regarding the status of the construction defect claims involving the common areas of the development.  This letter notified homeowners that (1) the Association had just filed its lawsuit on July 31, 2009, due to limitations concerns and bankruptcy of one defendant, and (2) the homeowners might be required to disclose that filing in connection with any pending sale or refinance of a unit.  Mediation was continuing, but the legal action filing had been deemed to be essential to preserve the claims.  Counsel stated that members of the firm would be present at the Association's annual meeting on September 16, 2009, to answer questions and discuss the Association's legal options and the status of the investigation and mediation efforts.

On January 13, 2010, the Board and its mediation and litigation committee sent out a notice of an informational meeting to all homeowners, at which counsel for the

7

Association would be present to provide owners with information about the status of the claims against the developers and builders of the complex. The meeting was scheduled for January 26, 2010 for presentations by the attorneys and some of the consultants retained to assist in connection with pursuing the claims.

Next, counsel for the Association sent all homeowners another status update on the claims against the developers and builders dated March 1, 2010. This letter referenced the homeowner meeting held January 26, 2010, and stated that additional defects had been identified and were being investigated. The homeowners were told that additional meetings would be scheduled when the results of the current investigation were obtained.

On March 20, 2012, counsel for the Association notified the individual homeowners that an upcoming open forum meeting was scheduled for March 24, 2012, to answer individual homeowners' questions regarding the litigation, particularly its relationship to the separate *Sarnecky* individual homeowners' action. Only some of the individual homeowners were parties to the separate action, and they were represented by their own attorneys (the Aguirre firm). The letter also stated that the Association's structural engineer would be attending the meeting to answer questions.

### B. *Discovery Dispute; Referee*

Defendants pursued discovery in the Association's action, requesting that several individual homeowners be produced for deposition and questioned about the litigation meetings' content, and any basis they might have learned there about any stigma damages

8

being claimed for their units. Defendants argued that the meetings were not held in a confidential context and any applicable privileges had been waived.

The Association objected to the questions and asserted that the information was protected from disclosure by the attorney-client privilege. The Association did not claim that the individual homeowners were also clients of its counsel, but rather that they were "third persons . . . to whom disclosure is reasonably necessary for the . . . accomplishment of the purpose for which the lawyer is consulted." (§ 952.) Thus, it claimed the individual homeowners were present to further the interests of the Association, as client, in the consultation.

When Defendants continued to seek information about the content of the meetings, the Association brought the issue before the appointed discovery referee, James A. Roberts. After a tentative ruling and hearing, the referee issued a report and recommendations for a protective order to be issued by the court. The referee concluded that the information requested about the content of the meetings was not subject to discovery because it was neither directly relevant to the action nor reasonably likely to lead to relevant evidence. In his June 4, 2012 letter decision, he stated his opinion that the Association had the better argument as to why such communications should be determined to be privileged. In his formal recommendation dated July 13, 2012, issued after a request for reconsideration, the referee stated that even though some of the letters from the Association's counsel to the homeowners, about the status of the litigation and the claims being made, were stated on their face not to be confidential and thus could be shown to lenders or prospective purchasers, the public content of those letters was

9

different from the content of the confidential information being discussed at the homeowner litigation meetings.

## C. Court Proceedings on Referee's Recommendation

Defendants brought their objections to the referee's recommendations to the trial court (Judge Vargas), who held several hearings.  In a series of proposed orders and rulings, Judge Vargas stated he "sustains defendant's objection" to the recommendation, but also stated "[t]he court overrules all other objections."  Although the order granted the protective order proposed by the referee, it was stamped "granted with modifications" (which were unclear), and the same order was stamped as "Rejected - Defective (Courtesy Copy Not Received by Court)."  Meanwhile, some of the individual homeowners' depositions were proceeding, out of over 30 that were set.

At the end of 2012, Judge Vargas retired and the case was reassigned to Judge Meyer.  In July 2013, Defendants moved to compel further answers, claiming that the information sought about the meetings at the individual homeowners' depositions was not protected by the attorney-client privilege, since there were no attorney-client relationships between the Association's counsel and the individual homeowners.

The Association responded that there was not any attorney-client relationship between its own counsel and the individual homeowners, but that nevertheless, its counsel's disclosures to those homeowners were privileged under section 952, as reasonably necessary for "the accomplishment of the purpose" for which the Association's lawyer was consulted.

10

At the hearing on the motion to compel, Judge Meyer stated that he could not understand Judge Vargas's orders, which were ambiguous and contradictory. The matter was taken under submission and the motion to compel granted on September 4, 2013: "This court cannot change Judge Vargas's order reversing the Discovery Referee's determination regarding an attorney-client relationship between the Association's counsel and individual homeowners."

This petition followed, asserting that the court erred in granting the motion to compel solely on the ground that it had to follow Judge Vargas's earlier order, which was ambiguous. Petitioner seeks orders compelling the trial court to vacate its orders allowing the requested discovery, and asks that we direct the trial court to order adoption of the referee's report. The Association contends this privilege question is one of first impression that should be considered by this court, before the Association or witnesses are required to disclose information it claims is privileged.[4]

We issued a stay, received additional briefing, and issued an order to show cause. Oral argument was held and the matter submitted.

DISCUSSION

In this context of Association litigation seeking recovery for construction defects in the common areas, we are asked to decide whether attorney-client privileges extend to communications, for which confidentiality was intended or preserved, between the

---

[4]    We assume that only those individual homeowners who are litigants in the *Sarnecky* action could be seeking stigma damages, and that the Association is not doing so regarding the common areas. In any case, the parties each assume that the same privilege questions apply to the Association and each individual homeowner deponent.

11

Association's counsel and third party nonclients (individual homeowners), at Association update meetings about the common area litigation, which were held for the individual homeowners. Although there may be some differences between the procedural posture of some of these third party nonclients (i.e., only some of the individual homeowners have filed the separate *Sarnecky* action seeking damages to their private units), we will treat the Association and its litigation counsel's communications to individual homeowners at the meetings as raising the same legal issue. Were such communications sufficiently confidential, and "reasonably necessary for the accomplishment of the purpose for which the [Association's] lawyer is consulted," based on common interests in the subject matter of the Association's litigation updates? (§§ 912, 952.)

I

*APPLICABLE STANDARDS*

A. Review of Privilege Rulings

"Extraordinary review of a discovery order will be granted when a ruling threatens immediate harm, such as loss of a privilege against disclosure, for which there is no other adequate remedy. [Citation.] ' "We review discovery orders under the abuse of discretion standard, and where the petitioner seeks relief from a discovery order that may undermine a privilege, we review the trial court's order by way of extraordinary writ. [Citation.]" ' " (*Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1493 (*Zurich*).) Each challenged discovery ruling concerning the recognition of a privilege is considered on a "case-by-case" basis, and we decide only the issues before us. (*Upjohn Co. v. United States* (1981) 449 U.S. 383, 396-397.)

12

In this context, " '[t]he trial court's determination will be set aside only when it has been demonstrated that there was "no legal justification" for the order granting or denying the discovery in question.' " (*OXY Resources, supra*, 115 Cal.App.4th 874, 887.) A trial court has abused its discretion in determining the applicability of a privilege when it utilizes the wrong legal standards to resolve the particular issue presented. (*Zurich, supra*, 155 Cal.App.4th 1485, 1493-1494.)

The party claiming privilege has the burden of establishing the preliminary fact that the communications were made during the course of an attorney-client relationship. (*D.I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729; *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 740.)

The overarching standards for the scope and applicability of a privilege are statutory in nature. (§ 911.) "The privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to expand them or to recognize implied exceptions." (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 206 (*Wells Fargo*); *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373; *Zurich, supra*, 155 Cal.App.4th 1485, 1494.) Public policy supports the proper scope of application of attorney-client privileges, to ensure " 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' " (*Mitchell*, *supra*, 37 Cal.3d 591, 599.)

The proper purposes of discovery are to obtain information on unprivileged matters that are relevant to the subject of the pending action, "if the matter either is itself

13

admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2017.010.) "For discovery purposes, information is relevant if it 'might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement.' [Citation.] Admissibility is not the test and information, unless privileged, is discoverable if it might reasonably lead to admissible evidence. [Citation.] . . . [T]he scope of discovery extends to any information that reasonably might lead to other evidence that would be admissible at trial. 'Thus, the scope of permissible discovery is one of reason, logic and common sense.' " (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1611-1612 (*Lipton*); italics omitted.)

### B. Procedural Status: No Reliance on Laches

Before analyzing the record in light of the above legal principles, we acknowledge that the sequence of discovery referee recommendations and two sets of superior court rulings have created some confusion on the basis for the rulings and the exact issues to be resolved. Defendants complain that the Association could have sought mandamus relief earlier, but did not do so until well into the discovery and litigation process, and thus, the petition arguably should be barred by laches. (See, e.g., *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 68; *Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 356.)

Writ review on the merits is appropriate to evaluate the rulings granting the motion to compel brought by Defendants, since they effectively disallowed the claims of attorney-client privilege raised by the Association with respect to the proposed questioning of individual homeowners. It is not necessary to enter into the debate about

14

what Judge Vargas meant in the rulings he made before he retired in 2012, or about Judge Meyer's subsequent interpretation of what Judge Vargas must have meant, when Judge Meyer found it determinative that there was no attorney-client relationship between the Association's counsel and individual homeowners. In light of the novel and important issues raised by the petition on the interpretation of section 952, we decline to take the route of relying on principles of laches to resolve this matter. (See *Lipton*, *supra*, 48 Cal.App.4th 1599, 1612.)

Moreover, the Association has requested in its petition that this court direct the trial court to order adoption of the referee's report. Such an intermediate step is not necessary, and instead we exercise our discretion to reach the merits of the privilege questions presented.

II

*ELIGIBILITY FOR PRIVILEGE COVERAGE*

A. Basic Statutory Criteria: Evidence Code

Two basic situations arise under section 952 for determining whether a "confidential communication" between a client and lawyer will retain its privileged character. Most importantly to the case before us, section 952 provides that confidentiality is retained if such an attorney-client communication is transmitted in confidence "*to no third persons other than those who are present to further the interest of the client in the consultation . . . .*" (§ 952, italics added.) Together, sections 912 and 952 will "permit sharing of privileged information *when it furthers the attorney-client relationship;* not simply when two or more parties might have overlapping interests."

15

(*McKesson HBOC, Inc. v. Superior Court* (2004) 115 Cal.App.4th 1229, 1237, italics added, citing *Raytheon Co. v. Superior Court* (1989) 208 Cal.App.3d 683.)

In general, section 912, subdivision (a) provides guidance for when disclosures operate to waive a privilege. One of its exceptions, section 912, subdivision (d) expressly clarifies it is not a waiver of privilege, under the following circumstances: "A disclosure in confidence of a communication that is protected by a privilege provided by [attorney-client privilege, § 954], *when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted*, is not a waiver of the privilege." (*OXY Resources, supra*, 115 Cal.App.4th at p. 890, italics added; see *First Pacific Networks, Inc. v. Atlantic Mut. Ins. Co.* (N.D.Cal. 1995) 163 F.R.D. 574, 581 [both sections 912 and 952 of the California Evidence Code contain the same concept, i.e., whether there is a reasonable necessity for disclosure to a third party, in order to accomplish the purpose of consulting the lawyer].)

Accordingly, section 952 allows privileges to be preserved when a family member, business associate or joint client (and/or the attorney for same) meets with the client and attorney who claim privilege, in regard to a matter of joint concern, "when disclosure of the communication is reasonably necessary to further the interest of the [claimant/litigant]." (See *Insurance Co. of North America v. Superior Court* (1980) 108

16

Cal.App.3d 758, 767; 2 Witkin, Cal. Evidence (5th ed. 2012) Witnesses, § 124, pp. 423-424.)[5]

In a related situation, public policy considerations were enunciated to assist in defining the proper scope of statutory protections of attorney-client confidential communications. The Supreme Court in *Mitchell, supra*, 37 Cal.3d 591, 611, was confronted with a defendant's discovery requests that were nominally intended to produce evidence relating to a plaintiff's claimed damages, in the form of questioning of the plaintiff about the nature and content of any warnings or information she had received from her attorney about the potential damages she was asserting. (*Id.* at p. 597.) In that case, the plaintiff was claiming injury from the defendants' wrongful environmental contamination, including her emotional distress stemming from fears of future physical harm that might be caused from the contamination. (*Id.* at p. 595.)

In the requested discovery in *Mitchell*, defense counsel arguably was seeking to inquire into whether the plaintiff and her counsel had discussed any potential physical harm to her from the contamination, "and if so, whether that discussion had contributed to plaintiff's distress." (*Mitchell, supra,* 37 Cal.3d 591, 610.) In considering privilege, the Supreme Court balanced the respective interests and concluded that such questioning

---

5    Parenthetically, we need not discuss at length the other statutory concept in section 952, that privileges remain when confidences are disclosed to persons "to whom disclosure is reasonably necessary *for the transmission of the information* or the accomplishment of the purpose for which the lawyer is consulted. . . ." (§ 952; italics added; 2 Witkin, Cal. Evidence, *supra,* Witnesses, § 125, pp. 424-425 [rule covers various kinds of agents and intermediaries, e.g., secretary, accountant, other expert, etc.].) The expert consultants who attended the litigation update meetings would fall into this category.

went too far, because it "might very well reveal much of plaintiff's investigative efforts and trial strategy." (*Ibid*.) The plaintiff's attorney-client privilege should protect against any such investigation by opposing counsel into confidential client communications about injury and damages. (*Id.* at pp. 610-611.)

Moreover, allowing such proposed discovery into attorney-client discussions would "potentially uphold a harassment tactic whereby defendants . . . are able to shift the focus of the case from damages caused by [their actions] to damages caused by allegedly inflammatory or false information provided by self-serving attorneys. . . . [T]his technique not only obfuscates many of the substantive issues in a case but also frequently places the wrong 'defendant' on trial." (*Mitchell, supra,* 37 Cal.3d 591, 610-611.) Permitting such discovery would constitute "an unwarranted abrogation of the attorney-client privilege," that would unjustifiably undermine the proper functioning of the judicial system. (*Id.* at p. 611.)

Having set forth these basic principles and policy limitations regarding the protected scope of the attorney-client privilege, we turn to the more specific questions presented about the application of the common interest doctrine in this situation.

### B. Common Interest Doctrine Definition

"Although the protection of the attorney-client privilege is absolute, the protection afforded by the common interest doctrine is qualified, because it depends on the content of the communication. . . . [T]here is 'no absolute brightline [sic] test which distinguishes between the parties [sic] "adversarial" interests and their "common" interests.' " (*OXY Resources, supra*, 115 Cal.App.4th 874, 896.)

18

Not only the content of the communication must be considered, but also the circumstances of the communication. "Applying these waiver principles in the context of communications among parties with common interests, it is essential that participants in an exchange have a reasonable expectation that information disclosed will remain confidential. If a disclosing party does not have a reasonable expectation that a third party will preserve the confidentiality of the information, then any applicable privileges are waived. An expectation of confidentiality, however, is not enough to avoid waiver. In addition, *disclosure of the information must be reasonably necessary for the accomplishment of the purpose for which the lawyer was consulted*. (Evid. Code, § 912, subd. (d).) Thus, '[f]or the common interest doctrine to attach, most courts seem to insist that the two parties have in common an interest in securing legal advice related to the same matter--and that the communications be made to advance their shared interest in securing legal advice on that common matter.' [Citation.]" (*OXY Resources, supra*, 115 Cal.App.4th at p. 891, italics added.)

In *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889, 915, the court expounded on the rules regarding the nonwaiver principles of sections 912 and 952. A communication to a lawyer, even where made in the presence of another person (e.g., a business associate or joint client, who is present to further the interest of the client in the consultation), and on a matter of joint concern, may retain a privileged character, within the existing scope of the privilege statutes. "Evidence Code sections 912 and 952, however, make no reference to common interests or joint concerns; they refer instead to a reasonable necessity of disclosure. Those two sections give rise to the common-interest

19

doctrine. . . . [T]he alignment of the parties' common interests may mean disclosures between them are reasonably necessary to accomplish the purposes for which they are consulting counsel." (*Citizens for Ceres, supra*, at p. 916.)[6]

In *Smith v. Laguna Sur Villas Community Assn.* (2000) 79 Cal.App.4th 639, 642 (*Smith*), the court analyzed discovery demands for attorney-client privileged information, that were made by appellants as condominium owners and members of their Association, regarding litigation materials created by the Association. Those owners were not individually named as plaintiffs in the Association's construction defect litigation against developers, so that the owners were not equivalent to the Association client that had retained the attorney to bring the lawsuit, and thus the owners could not be allowed to access the privileged information. The court explained, "Like closely held corporations and private trusts, the client [Association] is the entity that retained the attorney to act on its behalf." (*Id.* at pp. 642, 643 [§ 951, defining " 'client' " as the " 'person' " who

---

[6] In *Citizens for Ceres, supra*, 217 Cal.App.4th 889, the appellate court was addressing an arcane question under the California Environmental Quality Act, about whether a developer and a municipality have any "common interest" in the creation of a legally defensible environmental impact report about the developer's application. The appellate court was analyzing whether those two entities had waived the attorney-client and other privileges, with respect to the communications they disclosed to each other before the project was approved. This required interpretation of the terms of Public Resources Code section 21167.6, subdivision (e) (governing the preparation of the administrative record). The court held that the administrative record statute does not impliedly abrogate the lead agency's attorney-client privilege, but any privilege is nevertheless waived as to any documents shared with the developer's counsel, before the project is approved. (See 9 Miller & Starr, Cal. Real Estate (2013-2014 supp.) § 25A:6, pp. 100-101.) That case is factually distinguishable. Its general statement of the common interest doctrine is useful, although the court's application of it has been criticized by commentators. (*Ibid.*)

" 'directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer . . . . ' "].)  Thus, "[w]here the association sues in its own name without joining with it the individual unit owners, the association, not the unit owners, holds the attorney-client privilege."  (9 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 25B:110, p. 25B-233.)

In reaching its conclusions, the court in *Smith, supra*, 79 Cal.App.4th 639, relied on *Wells Fargo, supra*, 22 Cal.4th 201, 209, in which no "fiduciary" exception to the attorney-client privilege was allowed on behalf of beneficiaries of a trust, who had sought to discover confidential communications between their trustee and the outside trust counsel hired by the trustee.  It was immaterial that the trust had paid the attorney; such payments "do not suffice to create an attorney-client relationship."  (*Smith, supra,* at p. 645.)  Courts "do not enjoy the freedom to restrict California's statutory attorney-client privilege based on notions of policy or ad hoc justification."  (*Wells Fargo, supra*, at p. 209.)

In *Smith, supra*, 79 Cal.App.4th 639, the court colorfully addressed concerns about group client confidentiality and potentially conflicting loyalties of Association counsel, by stating:  "It is no secret that crowds cannot keep them.  Unlike directors, the residents owed no fiduciary duties to one another and may have been willing to waive or breach the attorney-client privilege for reasons unrelated to the best interests of the association.  Some residents may have had no defects in their units or may have had familial, personal or professional relationships with the defendants.  Indeed, it is likely that the developer in the underlying litigation itself may have owned one or more unsold units within the

21

complex. As [Association] points out, '[o]ne can only imagine the sleepless nights an attorney and the Board of Directors may incur if privileged information is placed in the hands of hundreds of homeowners who may not all have the same goals in mind.' With the privilege restricted to an association's board of directors, this is one worry, at least, that their lawyers can put to rest." (*Id.* at p. 645.)

C. Homeowners' Associations' Obligations: Civil Code Criteria

For purposes of evaluating the proper scope of the attorney-client privilege, we turn to the statutes governing the Association's obligations to its members. In former Civil Code section 1368.3 (now Civ. Code, § 5980), an association that was established to manage a common interest development is granted standing to sue in its own name, on matters concerning damage to the common area, or damage to separate interests that are affected by damage to the common areas, etc. (Civ. Code, § 5980; former § 1368.3, repealed by Stats. 2012, ch. 180, § 1, operative Jan. 1, 2014.)[7] As previously explained, after the Association filed its construction defect action in 2009 alleging damage to the common areas, individual homeowners hired their own attorneys to file a separate but

_____

[7] Compare *Wardleigh v. Second Judicial Dist. Court In and For County of Washoe* (Nev. 1995) 891 P.2d 1180, 1185, applying Nevada law that a homeowner's association lacks standing to file an action, but "when it acts as an agent or facilitator for homeowners who have retained counsel, Association officials so acting on behalf of the Association would be drawn into the privilege enjoyed by the homeowner clients," despite a lack of a direct attorney-client relationship with the homeowners in litigation sponsored by the Association. Further, "such representation by the Association will be privileged only to the extent that the Association acts on behalf of the homeowner clients in a setting where it is clear that the communications with the homeowners' counsel were intended to be privileged and confidential." (*Ibid.*) We need not rely on out-of-state law, as California law is sufficient.

22

coordinated action for damage to individual units (the *Sarnecky* action). However, the Association can seek redress for damage to separate interests that are affected by damage to the common areas, etc. (Civ. Code, § 5980.)

"The duties and powers of a homeowners association are controlled both by statute and by the association's governing documents." (*Ostayan*, *supra*, 110 Cal.App.4th 120, 126-127.) In that case, the appellate court observed that the "complex" relationship between the individual owners and the managing association of a common interest development " 'may depend on the function the association is fulfilling under the facts of each case.' " (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn*. (1999) 21 Cal.4th 249, 266.) Although the individual owner " 'has an economic interest in the proper business management of the development as a whole for the sake of maximizing the value of his or her investment,' " in other ways, " 'each individual owner, at least while residing in the development, has a personal, not strictly economic, interest in the appropriate management of the development . . . .' " (*Id.* at pp. 126-127, quoting *Lamden, supra,* at pp. 266-267.)

As explained already, the Act places certain obligations on an association to communicate with individual owners about any proposed construction defect litigation. Current Civil Code section 6150, subdivision (a) of the Act requires the board of an association to provide a written notice to each current member of the association, 30 days prior to the filing of any civil action by the association against the developer, "for alleged damage to the common areas, alleged damage to the separate interests that the association is obligated to maintain or repair, or alleged damage to the separate interests that arises

23

out of, or is integrally related to, damage to the common areas or separate interests that the association is obligated to maintain or repair." (*Ibid.*) Such a notice shall specify (1) a meeting will take place to discuss problems that may lead to the filing of a civil action; (2) what are the options available to address the problems; (3) the time and place of the meeting. (*Ibid.*) (If there are potential statute of limitations problems imminent, the association may give such notice within 30 days after the filing of the action; Civ. Code, § 6150, subd. (b); this method was evidently used here.)

In the CCRs applicable to this property, the Association is required not only to give such written notice of intended litigation to Association members, but also to obtain a vote of approval by more than 50 percent of the members, before filing the action. (CCRs, § 4.4.11.) This provision implements the protections of the individual homeowners' economic interests in the value of not only their own individual units, but also the development as a whole. (*Ostayan, supra*, 110 Cal.App.4th 120, 126-127.) It anticipates that investigation of common area defects could require individual homeowners to permit access and testing that affect their units.

III

*ANALYSIS; NO WAIVER FOUND*

In light of the above principles of law, we turn to the record and request for relief in this case.

A. Was Confidentiality of Communications Maintained at Meetings?

The common interest doctrine is properly characterized under California law "as a nonwaiver doctrine, analyzed under standard waiver principles applicable to the attorney-

24

client privilege and the work product doctrine." (*OXY Resources, supra*, 115 Cal.App.4th at p. 889, fn. omitted.) " '[F]or the common interest doctrine to attach, most courts seem to insist that the two parties have in common an interest in securing legal advice related to the same matter—and that the communications be made to advance their shared interest in securing legal advice on that common matter.' [Citation.]" (*Id.* at p. 891.)

Defendants argue that any confidentiality of communications at the meetings was initially waived through several different sets of circumstances. First, persons employed by or affiliated with Defendants, and who were also individual homeowners, were allowed to attend, and expert consultants attended and spoke at the meetings. (But see fn. 5, *ante*.) Second, a few homeowners later discussed issues raised at the meetings with their relatives and friends. Third, the letters announcing the meetings stated that the letters could be shared with potential buyers or lenders. Also, the Association had not kept confidential, but had made available to others, the numerous e-mails its counsel had received from individual homeowners, about the defects they were experiencing in their units.

In response, the Association provided the declaration of its managing agent, Nina McCarthy, stating that the Association and its counsel gave instructions that attendance at the litigation meetings was to be restricted to Seahaus owners only, not tenants, prospective buyers, realtors or other such third parties.

The concerns expressed in *Smith, supra,* 79 Cal.App.4th 639, about the difficulty of preserving confidentiality when a large crowd of homeowners is involved were outlined by the court in that case, in response to the individual homeowners' efforts to

25

access privileged material created by the association's lawyers. Such access was not necessarily intended to further the purpose of the association's lawyers' job, but was adverse to it. (*Id.* at p. 645.) Our situation is the converse, in which the Association and its Board and lawyers perceive that the Board has a duty to keep all the individual homeowners informed about common area litigation that might affect the value of the individual units.

Likewise, in *Wells Fargo, supra*, 22 Cal.4th 201, the individual beneficiaries were seeking to force disclosure of the trustee's privileged information, for their own dissident reasons. Again, our situation is the converse, in which the corporate entity is attempting to offer confidential legal information to other interested persons about matters in which the entity (the Association) and its members (individual homeowners) have some common interests, and which the attorneys for the Association are attempting to protect. Concededly, the interests of the Association and the individuals will not always be aligned, and it can be difficult to draw a line between their allied interests and their adverse interests. (See *OXY Resources, supra*, 115 Cal.App.4th at p. 896.) However, the Association was seeking to share its privileged information with homeowners, to the extent that it believes that they " 'all have the same goals in mind.' " (*Smith, supra*, 79 Cal.App.4th at p. 645.)

To determine the scope of the privilege, we look to the content of the subject communications, as well as the circumstances, for indications on whether the meetings will advance the common interests in the representation by counsel. (*OXY Resources, supra*, 115 Cal.App.4th at p. 891.) In considering the Civil Code sections listed above

26

about the initiation of construction defect litigation, together with the Association's governing documents, we conclude that the Association's duties and powers include communicating with those parties who have closely aligned common interests, and the individual homeowners at the development have such common interests in this particular context. On balance, these circumstances show that the Association and its counsel, and the individual homeowners who participated in the litigation meetings, maintained a reasonable expectation that information to be disclosed about the status of the litigation was confidential in nature. "Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters." (*Mitchell, supra*, 37 Cal.3d 591, 599.) In the role of client, the Association could properly take into account not only its own goals of protecting the common areas, but also the interests of its individual member homeowners in their units, as related to the common areas that the Association was seeking to repair. The relationship of the two construction defect actions was close enough so that the individual homeowners had common interests in the legal status of the Association's action. (See Civ. Code, § 6150, subd. (a).) Moreover, the presence of some homeowners who may have had conflicting loyalties (homeowners who were affiliated with Defendants) did not destroy all other common interests.

We conclude that the subject litigation meetings were held to accomplish the purpose for which the Association's lawyers were consulted. (§ 912, subd. (d); *OXY Resources, supra*, 115 Cal.App.4th at p. 891.) The common interest doctrine and its

27

protection of confidentiality of these communications apply as a matter of law to these circumstances.

        B.  Was "Reasonable Necessity" Shown for Disclosures at Meetings?

We turn to the related question of whether the record supports the conclusion that it was "reasonably" necessary to the purpose of the Association's attorney retention for such disclosures to be made at the subject meetings, to the individual homeowners. (§§ 952, 912, subd. (d).)  Defendants appear to argue that even if the original meeting, seeking individual voter approval of the Board's decision to pursue the litigation, was required by the CCRs and therefore was reasonably necessary, any subsequent meetings lost that protected status.  We disagree.  Both the content and the circumstances of each set of communications made, about the Association's legal strategy or advice, support conclusions that each stage of these disclosures was intended to carry out the purpose of pursuing the Association's lawsuit (to recover for asserted damage to the common areas) in such a way that would be consistent with and not interfere with the rights of the individual homeowners.

Although the two sets of plaintiffs involved here have some common interests in obtaining legal advice about their respective and distinct property rights, those rights will ultimately differ and are being resolved in separate lawsuits.  Nevertheless, the Association's attorney was attempting to communicate in the subject meetings with other stakeholders, the individual homeowners, in a manner that would advance their shared interests in securing advice on similar legal and factual issues.  (*OXY Resources, supra*, 115 Cal.App.4th at pp. 887-888.)  These circumstances were enough to connect the

28

disclosure of the litigation update information with the statutorily required "reasonably necessary" steps toward accomplishing the purpose for which the lawyers were consulted. (§ 912, subd. (d).)

If we agree with the position taken by Defendants, which is that the Association's attorneys' communications to individual homeowners were not confidential and merely served to create inflated expectations of individualized stigma damages, we run the risk of offending the public policy considerations set out in *Mitchell, supra,* 37 Cal.3d at pages 609 through 610. Even if discovery into privileged discussions between attorneys and clients would nominally be intended to produce some evidence relating to the issues about damages, "it might very well reveal much of plaintiff's investigative efforts and trial strategy." (*Id*. at p. 610.) Such discovery about attorney-client communications regarding potential damage evaluations or items "would potentially uphold a harassment tactic whereby defendants . . . are able to shift the focus of the case from damages caused by [their actions] to damages caused by allegedly inflammatory or false information provided by self-serving attorneys. . . . [T]his technique not only obfuscates many of the substantive issues in a case but also frequently places the wrong 'defendant' on trial." (*Ibid*.)

In reaching this conclusion and granting the petition, we do not expand the scope of statutory privileges, but instead apply recognized rules to an unusual set of facts. (*Wells Fargo, supra,* 22 Cal.4th 201, 206.) The trial court erred in granting Defendants' motion to compel deposition answers from individual homeowners about the content and strategies disclosed to them by the Association or its counsel at the litigation update

meetings, and the trial court must deny the motion and issue a protective order concerning the attorney-client privilege in light of the common interest doctrine.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its September 4, 2013 order denying assertion of the attorney-client privilege and compelling discovery, and enter a new order issuing a protective order and denying the motion to compel. The stay issued on September 17, 2013 is vacated. Petitioner is entitled to costs in the writ proceeding.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

30