Filed 12/3/15  P. v. Dolan CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARSHALL DOLAN,<br><br>    Defendant and Appellant. | B258257<br><br>(Los Angeles County<br>Super. Ct. No. BA419836) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Dennis J. Landin, Judge.  Affirmed.

Erik Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Marshall Dolan (defendant) raises two challenges to his convictions of four counts of robbery, and the resulting 24-year prison sentence. Specifically, he argues that the trial court erred in admitting (1) evidence of a further robbery to show intent and identity, and (2) a letter defendant wrote to a codefendant's lawyer disavowing the codefendant's involvement in the robberies. We conclude there was no error, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of June 2, 2013, Robert Banfitch (Banfitch) and Steven Tauv (Tauv) walked out of The Eagle Bar. Two African-American men approached them. One was tall; the other, short. Both wore hoodies. The shorter man pulled out a revolver; the taller man, a taser. Banfitch and Tauv handed over their belongings, which included a cigarette case with an image of Woody Allen and an iPhone. The shorter man struck Tauv in the head with the revolver when Tauv tried to keep his I.D. card.

That same morning, Shannon Lloyd (Lloyd) and Mohammad Hammad (Hammad) also left The Eagle Bar. They, too, were approached by two African-American men wearing hoodies. One of them asked for a "light" for a cigarette before the two men drew a revolver and a taser. This time, the two men switched weapons: The shorter man held the taser and the taller man held the gun. They demanded the victims' belongings. The man with the taser deployed it twice on Hammad. Both robbers left in a dark-colored vehicle.

One of the victims from the first robbery activated the "Find My iPhone" application on his stolen phone, and the application led police straight to defendant. Defendant was found at a gas station, standing beside a dark-colored vehicle with the iPhone pinging in his pocket. Defendant was wearing a hoodie, and was in possession of the Woody Allen cigarette case as well as 11 credit cards and 8 California identification cards belonging to various people, including Tauv and Banfitch. Tauv and Lloyd identified defendant as one of the two robbers in an in-field "show up." Tauv said he was "a hundred percent sure" defendant was the shorter robber with the gun based on his clothing and his face; Lloyd recognized defendant's face and clothing, and said he was the robber who tased Hammad.

2

The People charged defendant with four counts of robbery (Pen. Code, § 211)[1], one count for each of the four victims. The People also alleged as to the first robbery that defendant personally used a firearm (§ 12022.53, subd. (b)), and as to both robberies that a principal was armed with a firearm (§ 12022, subd. (a)(1))[2]. The People also alleged that defendant had served two prior prison terms (§ 667.5, subd. (b)).

A jury convicted defendant of all counts, and found the firearm allegations to be true. After defendant waived his right to a jury trial on the prior convictions, the trial court found them to be true.

The trial court imposed a 24-year prison term. The court imposed a high term of five years and a consecutive 10-year term for personal use of a firearm for the first robbery count (involving Tauv); an additional four years and four months for the second robbery count and personal use of a firearm (involving Banfitch); two additional 16 month terms for the third and fourth robbery counts as well as the principal's use of a firearm (involving Lloyd and Hammad); and two additional one-year sentences for each prior prison term.

Defendant timely appeals.

## DISCUSSION

### I. Evidence of Third Robbery

The People sought to introduce evidence that defendant committed a third robbery for the purpose of proving defendant's identity as one of the robbers and to negate defendant's testimony that he merely happened upon many of the items he possessed when he was arrested. The third robbery occurred 15 blocks away and two hours before the two charged robberies. Two African-American men wearing hoodies, one taller and one shorter, approached the two male victims as they were getting out of their car. One of the men asked for a cigarette before the shorter man pulled out a revolver and said,

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The People initially alleged that defendant personally used a firearm in the second robbery as well, but later dismissed those allegations.

3

"This is a robbery."  The taller robber then drew and deployed a taser.  When one of the victims hesitated in handing over his belongings, the shorter man struck that victim in the face with the revolver.  At the time defendant was arrested, he possessed one of the third robbery victim's driver's license, insurance card, and other credit cards.  The trial court ruled that the evidence was admissible, and that it was not "unduly prejudicial given the nature of the current charges . . . as well as the similarity of this uncharged act."

Evidence of a defendant's uncharged acts are admissible to prove, among other things, the defendant's intent or identity.  (Evid. Code, § 1101, subd. (b).)  However, before evidence of uncharged acts will be admitted for either of these purposes, the trial court must find that (1) the defendant's intent or identity is an issue in the pending case; (2) the uncharged acts have the requisite degree of similarity; and (3) the probative value of the uncharged act evidence is not substantially outweighed by the "'substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'"  (*People v. Lindberg* (2008) 45 Cal.4th 1, 22; Evid. Code, § 352.)  The required level of similarity between the uncharged acts and the charged acts varies, depending on the purpose for which the uncharged acts are offered.  The highest degree of similarity is required when the uncharged acts are offered to prove identity; in that instance, the "'"pattern and characteristics of the [charged and uncharged] crimes must be so unusual and distinctive as to be like a signature.'"'"  (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)  A lesser degree of similarity is permitted when the uncharged acts are offered to prove the existence of a common design or plan; in that instance, there must be a "'"concurrence of common features.'"'"  (*Ibid.*)  For all other permissible purposes, including to prove intent, the charged and uncharged acts need only be "'"sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]'"'"  (*Ibid.*)

Defendant argues that the trial court erred in admitting evidence of the uncharged, third robbery for three reasons:  (1) the third robbery was not "distinctive" enough to be admitted to prove identity; (2) the third robbery was unduly prejudicial when balanced against its probative value; and (3) the trial court did not give an instruction limiting the

4

purposes for which the jury could consider the third robbery. We review the trial court's admission of this evidence for an abuse of discretion (*People v. Harris* (2013) 57 Cal.4th 804, 841), and conclude there was no abuse here.[3]

To begin, the trial court did not abuse its discretion in determining that the third robbery and the charged robberies were "so unusual and distinctive as to be like a signature." All three robberies took place within hours and blocks of each other. In each of the three robberies, two African-American men, one tall and one short, approached two male victims; in each robbery, one of the assailants was armed with a revolver and the other with a taser; in each robbery, the shorter assailant struck a victim with a revolver or tased him when the victim did not surrender his belongings quickly; and in two of the robberies, the assailants used the same ruse (asking for a "light" or a cigarette"). Indeed, defendant himself acknowledges that there are "compelling similarities" at "first blush" among all three robberies. However, defendant goes on to argue that the three robberies are not identical because they differed in how the armed assailant held the revolver in his hands. But identicalness is not the test, and the similarities among the three robberies here are striking enough to function as a signature, especially given their close proximity in both time and space. (Accord, *People v. Miller* (1990) 50 Cal.3d 954, 989 ["the likelihood of a particular group of geographically proximate crimes being unrelated diminishes as those crimes are found to share more and more common characteristics"].) In any event, this evidence was certainly similar enough to satisfy the lower similarity threshold necessary to support its admission to prove defendant's intent (and thereby rebut defendant's claim that he came upon the items in his possession fortuitously).

Further, the trial court balanced the probative value of this evidence against the

---

**3**      The People argue that we need not engage in any analysis under Evidence Code section 1101, subdivision (b), because the third robbery was admitted solely to show how the third robbery victim's license and other cards were found in defendant's possession. We reject this argument, as it directly contradicts the People's argument before the trial court.

danger of undue prejudice on the record, and did not abuse its discretion in so doing. The uncharged robbery was relevant to show that defendant committed the charged robberies and to negate his defense of "innocent" possession of the stolen items. Conversely, the third robbery was no more inflammatory than the charged robberies; while it was certainly prejudicial to defendant (as all relevant evidence introduced by the People is), it was not *unfairly* prejudicial to him.

Lastly, defendant may not complain on appeal of the trial court's failure to give a limiting instruction. Although defendant objected to evidence of the third robbery, he never requested a limiting instruction once the court overruled that objection. This amounts to a forfeiture. (*People v. Ledesma* (2006) 39 Cal.4th 641, 697 ["[A] trial court is not required to give [a] limiting instruction . . . in the absence of a request"].) Even if we assume the absence of limiting instruction was erroneous, it was not prejudicial. The failure to give a limiting instruction is harmless when it "would not have significantly aided [the] defendant[] under the[] facts or weakened the strength of the evidence of guilt the jury properly could have considered." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1054.) In this case, the evidence of defendant's identity as one of the two robbers was overwhelming. He was positively identified by two of the four victims in the charged robberies; one of those victim's iPhone was pinging in his pocket when the police tracked him down; and defendant possessed other victims' property as well.

## II.    Defendant's Letter To His Codefendant's Counsel

The People initially detained and charged Bennie Story (Story) as the second robber. Defendant and Story had separate counsel representing them. Just 12 days after defendant's arrest, and before the People dismissed the charges against Story, defendant transmitted a handwritten note to Story's attorney that stated: "The robberies that was committed on 6-2-2013, Mr. Story didn't have knowledge of them that had taken place." (*Sic*.) Defendant signed the note "[u]nder penalty of perjury." Presumably, Story's attorney later passed the letter along to the prosecutor. When defendant announced his intention to testify, the People indicated they would cross-examine defendant regarding the letter. Defendant objected, arguing that the letter fell within the attorney-client

6

privilege because both defendant and Story were "working together" and their "objective . . . was the same" because they were trying to prove that neither Story nor defendant had "[any]thing to do with" the robberies. The trial court overruled the objection, finding that there was no evidence of any joint defense agreement and the defendant's disclosure of the letter to Story's attorney consequently waived the privilege.

The attorney-client privilege protects "information transmitted between a client and his . . . lawyer in the course of that relationship and in confidence . . . ." (Evid. Code, § 952.) As a general matter, that privilege is waived as to any information the client voluntarily discloses to a third party. (*Id.*, § 912, subd. (a).) But where that third party is aligned with the client in ongoing litigation, whether the client's disclosure amounts to a waiver turns on the applicability of the "common interest doctrine." "Under the common interest doctrine, [a client] can disclose [privileged information] to an attorney representing a separate client without waiving the [attorney-client privilege] if (1) the disclosure relates to a common interest of the attorneys' respective clients; (2) the [client] has a reasonable expectation that the other attorney will preserve confidentiality; and (3) the disclosure is reasonably necessary for the accomplishment of the purpose for which the [client's own attorney] was consulted." (*Meza v. H. Muehlstein & Co., Inc.* (2009) 176 Cal.App.4th 969, 981 (*Meza*); *Seahaus La Jolla Owners Assn. v. Superior Court* (2014) 224 Cal.App.4th 754, 770; *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889, 915; *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 891 (*OXY Resources*); Evid. Code, §§ 912, subd. (d) & 952.) The client bears the burden of proving that the doctrine applies. (*OXY Resources*, at p. 890.)

Defendant argues that the trial court erred in finding a waiver because (1) the common interest doctrine applies, thereby precluding waiver, and (2) the court's ruling conflicts with *People v. Benge* (1982) 131 Cal.App.3d 336 (*Benge*), *People v. Gardner* (1980) 106 Cal.App.3d 882 (*Gardner*), and *Cooke v. Superior Court* (1978) 83 Cal.App.3d 582 (*Cooke*). We reject both arguments.

In evaluating whether the common interest doctrine applies, we only assess whether substantial evidence supports the trial court's ruling (*Meza*, *supra*, 176

7

Cal.App.4th at pp. 982-983), and here it does. Whether or not defendant has shown that he and Story share a "common interest" because they were at the time named as codefendants in the same case, defendant did not carry his burden of proof with respect to the last two requirements of the doctrine. Defendant had no "reasonable expectation" that Story's attorney would keep the letter confidential because, as defendant notes in his opening brief, "Story's attorney had to disclose the [letter] in order to further the interests of his own client." Moreover, defendant's letter states that Story "didn't have knowledge of [the robberies] that had taken place," but that is a statement that only someone "in the know" himself could make. Because defendant in his letter effectively tries to take all the blame for the robberies, the disclosure of the letter is not "reasonably necessary for the accomplishment of the purpose for which" defendant consulted with his own attorney (which is, presumably, to help his defense—not hurt it). Defendant argues that he meant to say in the letter that neither *he* nor *Story* had any knowledge of the robberies, and that the letter was thus designed to help both of them obtain acquittals. However, the plain language of the letter is substantial evidence to the contrary.

This conclusion is consistent with the decisions defendant cites. *Benge* held that statements made at a closed union meeting to union attorneys regarding the employees' exposure to lead poisoning were privileged, even though it was a group meeting. (*Benge*, *supra*, 131 Cal.App.3d at pp. 347-348.) *Gardner* involved a criminal defendant who wrote a letter to his attorney taking the blame for a crime and exonerating his two codefendants; jail officials seized the letter from the defendant's cell before it was mailed to the attorney. *Gardner* held that the letter was privileged, even though the defendant told one of the two codefendants that he had written a letter exonerating them. (*Gardner*, *supra*, 106 Cal.App.3d at pp. 887-889.) *Cooke* held that a divorcing spouse's communications to his attorney and business partners regarding his assets with respect to ongoing divorce proceedings were privileged, even though the business partners were not attorneys. (*Cooke*, *supra*, 83 Cal.App.3d at p. 588.)

*Benge* and *Cooke* are entirely dissimilar to this case. *Gardner* is more factually analogous, but the defendant there wrote the letter to his *own* attorney regarding his

8

defense and disclosed part of its contents to a codefendant; defendant in this case wrote and transmitted the entire letter to someone else's attorney. There is nothing inconsistent with a finding of no waiver in the first instance, and a finding of waiver in the second. Just as importantly, *Gardner* did not purport to apply the common interest doctrine.

## III.    Cumulative Error

Defendant lastly argues that the cumulative effect of the foregoing alleged errors requires reversal. Because we have concluded there was no error, defendant's cumulative error argument necessarily fails.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                         HOFFSTADT


We concur:

_____, P.J.
          BOREN


_____, J.
       ASHMANN-GERST

9
